87 So.2d 309

STATE of Louisiana ex rel. Mrs. Mary MAGLIORE, wife of Arthuur Bertucci,

v.

Johnny SARAGUSA.

No. 42137.

March 26, 1956.

Rehearing Denied May 7, 1956.

John P. Dowling, New Orleans, for appellant.

Weber & Weber, Baton Rouge, for defendant-appellee.

HAMITER, Justice.

The instant appeal presents an issue between divorced parents respecting the custody of their daughter who was approximately nine years old at the time of the trial in July, 1954. It was perfected by the mother when the district court dismissed this habeas corpus proceeding instituted by her.

In 1944 the litigants married and established their matrimonial domicile in the City of New Orleans. Of the marriage there were two children: Phiney Saragusa, born on July 21, 1945 and whose custody is sought in these proceedings, and Sue Ann Saragusa, born May 28, 1949.

On August 1, 1949 the wife left the matrimonial domicile, taking Sue Ann with her but permitting Phiney to remain with the husband. She continued to live in New

Orleans; whereas, he, one month later, moved with Phiney to the home of his mother and father in Hammond and obtained employment in that city.

Subsequently, on November 9, 1951, the wife obtained a judgment of divorce in a suit brought by her (apparently it was granted on the ground of living separate and apart for more than two years). No question of custody was raised or determined in the divorce proceeding, and the care of the children continued as it had been since the actual separation.

On December 12, 1951, or one month and three days after the judgment of divorce, the plaintiff wife entered into a second marriage with one Arthur Bertucci. However, her present habeas corpus proceeding for the custody of the child was not commenced until July 6, 1954—about two and one-half years later and almost five years subsequent to the actual separation from the defendant.

 The parties hereto recognize the legal principles by which our courts are governed in determining which of the divorced parents shall have the custody of a child or children. These are precisely set forth in the following language taken from Guillory v. Guillory, 221 La. 374, 59 So.2d 424, 425: "A mother is entitled to the custody of her child unless it be shown that she is morally unfit or that it would be a greater advantage to award its custody to its father. The paramount consideration in determining to whom the custody of the child should be granted is the welfare of the child. In awarding the custody of the child a large discretion is left to the trial judge, which, of course, is subject to review. A reasonable latitude must be left to the trial judge and his judgment is entitled to great weight. * * * This case, as in many cases involving the custody of children, resolves itself into a question of fact. * * *" See also State ex rel. Theriot v. Pulling, 209 La. 871, 25 So.2d 620 and Ard v. Ard, 210 La. 869, 28 So.2d 461.

The only question presently before this court, therefore, is whether the trial judge, who saw and heard the witnesses, abused his discretion in determining that Phiney's welfare would best be served by continuing the custody with the father who had theretofore enjoyed it for almost five years.

The record conclusively discloses that the mother abandoned her daughter to the care of the father when she left the matrimonial domicile and that she did not thereafter attempt to visit the child until September, 1953, a period of more than four years. In explanation of the abandonment she testified that for economic and health reasons she could not care for both children. It appears, however, that at all times her mother and a married brother lived nearby; and there was no testimony that they would have been unwilling or unable to assist her. Too, her remarriage in December, 1951 to Bertucci, with whom she had been dating since May of 1950, was a financially successful one; yet she made no effort to obtain custody of Phiney until 1954.

As to the failure to see her daughter until September, 1953, plaintiff expressed the belief that had she attempted any visits the father's belligerent attitude toward her would have resulted in ill effects on the child. But her own testimony, as well as that of the defendant, shows that she was never denied visitation privileges. In fact, in September, 1953, the defendant granted the first request made for permitting Phiney to spend a week end in the New Orleans home of plaintiff and her second husband.

When asked if she had given birthday and Christmas gifts to the child, plaintiff stated that she had sent some by way of her brother and sister-in-law. These persons, however, were not called to give testimony in corroboration of that statement. And there is evidence in the record that the child at no time received any such gifts from her.

The defendant and Phiney, as above shown, lived in the home of his parents in Hammond for some two years after the plaintiff left them. In December, 1951 he remarried and moved to Baton Rouge with the child and his second wife. About June 1, 1954, when defendant's separation from the latter occurred, the child was returned to his father's home in Hammond (meanwhile, in 1953, his mother had died).

During the trial plaintiff sought to show that Phiney was mistreated by the defendant, or with his consent, while living with him and his second wife in Baton Rouge; but she failed in the attempt. The evidence is overwhelming to the effect that he was devoted to her, treated her with great kindness at all times, and provided amply for her needs.

In oral argument and brief in this court plaintiff's counsel emphasizes defendant's statement, made under cross examination, that in his father's home to which the child was returned there lived a person who had served a sentence for a violation of the narcotic statute. According to the defendant such person was his sister's husband and had been released from the state penitentiary two or three years previously. He explained, however, that following his mother's death the sister and brother in law (Mr. and Mrs. Pete Albano) went to live with his father; that the brother-in-law was gainfully employed; and that the returning of the child there was merely a temporary measure which had been caused by the separation of his second wife only six weeks before. The record additionally establishes that Phiney was not living exclusively with her grandfather, but that she spent part of her time with another married sister of the defendant—a Mrs. Angeline Michelli, with whom she would make her home if custody be granted to the defendant. There was no evidence disclosing that the brother-in-law had been guilty of any law violation since his release from the penitentiary or that the child has been or would be harmed in any manner by the mentioned temporary measure.

The Michelli home, in which the defendant proposed to keep the child, was shown

to be entirely acceptable. Mrs. Michelli, with whom Phiney is well acquainted and for whom she has much affection, lives with her husband and three children (one about two years older than Phiney) in a large attractive house on a farm which they own near Hammond. There the defendant could visit several times weekly while continuing his work in Baton Rouge, some 40 miles away.

Since this proposed arrangement would not permit the father to be constantly with the child, plaintiff suggests that it would be improper. In Guillory v. Guillory, supra, which involved an almost identical situation, we said: " * * * The appellant makes much of the fact that the father of the child subsequently married and separated from his second wife and the fact that he is now employed as the manager of a night-club, some eighty miles away. She seems to think that because the father only visits the child two or three times a week should have a bearing on the case. However, she does not point out a single fact to show the child is not receiving every care in the home of its grandparents. We can only determine the future from what has happened in the past. The father has always thought of and looked after the welfare of the child, but the appellant has not. Under the circumstances we cannot say that it would be to the best interest of the child to change the custody of it or that the trial judge abused his discretion in refusing to do so."

Likewise, in Ard v. Ard, supra [210 La. 869, 28 So.2d 462], we observed: "Plaintiff's first efforts to obtain the legal custody of the children following the abandonment occurred in 1945 through the institution of this suit, although she testified that on several occasions she requested defendant to give them to her. During the intervening eight years and up until the time of the trial, the boy was reared entirely by the father, while the girl was cared for partly by the father but principally by a paternal aunt, Sarah Brumfield, who was made a party to this suit; and, according to several reputable disinterested witnesses, both have received and are receiving all possible care, support and advantage. On the other hand, very little interest in or attention to the children, if any, has been displayed by plaintiff since she abandoned them.

"In support of his judgment herein, awarding the custody of the children to defendant, the trial judge assigned no written reasons. Obviously, he concluded that this is one of those exceptional cases wherein children are entrusted to the father, rather than to the mother, when it is for their greater advantage. Under the circumstances shown by the record we cannot say that in reaching his conclusion he has abused the discretion vested in him. For a mother to deliberately abandon her children of very tender ages, to make no effort to secure their legal custody for eight years, and to be generally disinterested in them for that long period, as was the case with this mother, are factors that combine to strongly in-

dicate that she is unconcerned with their welfare, incapable of caring for them, and unsuited for their custody."

What was stated in either or both of those cases can well be paraphrased and applied to the circumstances of the instant controversy. Therefore, we cannot conclude herein that the trial judge abused his discretion in determining that it would be to the best interest and welfare of the involved child to remain in the custody of her father.

For the reasons assigned the judgment appealed from is affirmed.

McCALEB, Justice (dissenting).

I do not think that the welfare of the ten year old girl is best served by permitting her father to remain as her custodian. The record, while failing to indicate any lack of moral fitness whatsoever on the part of the mother, does contain uncontroverted testimony to the effect that the father engaged in immoral practices while married to the mother which precipitated the separation and the subsequent divorce. In addition, after the father's separation from his second wife, the child was temporarily placed by him in the home of his father (the child's grandfather) wherein also resided a person who had been convicted as a user of marijuana.

At the present time, it appears that the father has not yet made a permanent home for the child but proposes to place her in the home of his brother-in-law and sister.

Aside from other considerations, it does not appear to me that this periodic moving of the child is beneficial to her welfare. I believe that as the mother, who is ready, able and willing to care for the child, can provide her with a good home and reunite her with her younger sister, the child's future happiness will be considerably enhanced by a change of custody. While it is true that the ruling of the trial judge is entitled to great weight in these matters, I do not feel that this Court should regard his conclusions as so unerring as to render them practically infallible.

I respectfully dissent.